ZAYRE CORPORATION,
Plaintiff–Appellee,

v.

S.M. & R. CO., INC.,
Defendant–Appellant.

No. 88–1070.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 20, 1988.

Decided Aug. 9, 1989.

Robert Dunn Glick, Schwartz, Cooper Kolb & Gaynor, Chtd., Narcisse A. Brown, Laura A. Lipinski, Chicago, Ill., for defendant-appellant.

James A. Cherney, Latham & Watkins, Kenneth K. Dort, Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and CUDAHY and MANION, Circuit Judges.

MANION, Circuit Judge.

In October 1980, Zayre Corporation agreed to allow SM & R Company to operate jewelry departments in Zayre's stores. Zayre and SM & R executed a Master Concession Agreement, a detailed document that set forth Zayre's and SM & R's rights and obligations. One of Zayre's obligations was to pay jewelry department employees' wages and benefits on SM & R's account, and to periodically charge SM & R for these payments. SM & R, in turn, agreed to reimburse Zayre for the payments Zayre made to the employees.

The Master Agreement provided that at specified times after the first Saturday of January 1984, Zayre could terminate its concession arrangement with SM & R. During the summer of 1984, Zayre indicated that it would be terminating the Master Agreement in February 1985. In anticipation of the Master Agreement's termination, Zayre and SM & R began to prepare the jewelry departments for the transfer of management to Zayre. Two letters from Malcolm Sherman, Zayre's president, to Maxwell Pohn, SM & R's president and CEO, summarized the preparations. Those letters revealed, among other things, that SM & R was to continue managing the jewelry departments through the end of January 1985 as it had in the past. As part of its ongoing management, SM & R was to buy merchandise in the fall of 1984 for resale at Zayre stores in the spring of 1985.

As of February 1985, the Master Agreement was officially terminated. Zayre and SM & R reconciled accounts and executed a Settlement Agreement to settle disputes

that had arisen during the reconciliation. The Settlement Agreement provided, among other things, that SM & R would reimburse Zayre for any additional vacation pay to jewelry department employees that had accrued during the time that SM & R had operated the jewelry departments. Zayre subsequently sent invoices to SM & R for the vacation pay SM & R owed; those invoices showed a total balance due of $61,539.40. The invoices included computer printouts that showed Zayre's payments to jewelry department employees. Despite Zayre's requests, however, SM & R refused to pay.

In July 1986, Zayre sued SM & R in the district court. Counts I, II, and III sought reimbursement of the $61,534.40 from SM & R. (The complaint also included other unrelated claims that are not at issue in this appeal.) SM & R responded to Zayre's suit by filing a counterclaim. Count II of the counterclaim (the only counterclaim count before us on this appeal) alleged that Zayre had agreed with SM & R that SM & R would design, buy, and sell at a markup to Zayre, jewelry anticipated to be sold at Zayre stores in the spring of 1985. SM & R alleged that it bought the jewelry but that Zayre breached the contract by failing to buy it; as a consequence, SM & R alleged that it lost $400,000 in profit by having to sell the jewelry to somebody else.

Zayre filed a motion for summary judgment on Counts I–III of its complaint and Count II of SM & R's counterclaim. The district court granted that motion. The court also awarded Zayre prejudgment interest, and properly entered final judgment pursuant to Fed.R.Civ.P. 54(b). SM & R appeals the summary judgment and the prejudgment interest award.

## I.

■ Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The moving party bears the initial burden of showing that no genuine issue of material fact exists. See *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1267

(7th Cir.1986). Once the moving party has demonstrated the absence of any genuine factual issues, the nonmoving party may not merely rest upon the allegations or denials in its pleadings but must present specific facts showing that a genuine issue exists for trial. See Fed.R.Civ.P. 56(e).

Regarding Zayre's claim for reimbursement, SM & R concedes that it owes Zayre money for vacation pay Zayre paid on SM & R's account. The only dispute is over the amount. To support its motion for summary judgment on the reimbursement claim, Zayre submitted an affidavit from its vice president-controller, Donald Campbell. Along with Campbell's affidavit, Zayre submitted invoices that it had sent to SM & R. Attached to the invoices were computer printouts that showed the amounts of vacation pay that Zayre had paid to jewelry department employees on SM & R's account. The invoices and printouts showed that Zayre had paid $61,539.40.

Campbell's affidavit stated that he personally knew, and was competent to testify to, the facts in the affidavit. According to the affidavit, Zayre had sent a number of invoices (including the computer printouts) at various times to SM & R but SM & R failed to reimburse Zayre for any of the vacation pay. The affidavit went on to state that Campbell had reviewed copies of the unpaid invoices and printouts and that the printouts were "based upon information kept in Zayre's ordinary course of business, and accurately reflect Zayre's actual payment to [jewelry store employees] for vacation pay which accrued during SM & R's occupancy of the … jewelry … departments."

SM & R contends that the district court erred in entering summary judgment for Zayre on the reimbursement claim because the computer printouts supporting Zayre's claim would not have been admissible in evidence. See *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir.1985); James W. Moore & Jeremy C. Wicker, 6 *Moore's Federal Practice*, ¶ 56.22[1], at 56–759 (2d ed. 1988) ("Submitted exhibits and documents must be admissible in evidence."). According to SM & R, Zayre has

failed to properly authenticate the printouts, or to establish a sufficient foundation to admit the printouts—admittedly hearsay—as business records because Zayre has failed to present evidence regarding, among other things, the source of data for the printouts, the data's accuracy, the input procedures used to feed the data into the computer, or whether the computer was working properly. See Fed.R.Evid. 901(b)(9) (authentication); Fed.R.Evid. 803(6); *United States v. Croft*, 750 F.2d 1354, 1363–65 (7th Cir.1984); *United States v. Weatherspoon*, 581 F.2d 595, 598 (7th Cir.1978). SM & R also complains that Zayre has not established that Campbell was qualified to establish the foundation because his affidavit does not show that he was the "custodian or [an] otherwise qualified witness," Fed.R.Evid. 803(6), and that Zayre has not established that the printouts were made as a routine company practice. Finally, SM & R claims that the printouts were summary evidence under Fed.R.Evid. 1006 and that they were inadmissible as summaries because Zayre had not made the documents underlying the summaries available to SM & R.

■ It is not entirely clear that the computer printouts are summaries. Cf. *United States v. Russo*, 480 F.2d 1228, 1240–41 (6th Cir.1973) (computer printout listing every claim paid by health insurer during a year was not a summary but an original record). But even if they are, SM & R's Rule 1006 argument is meritless. The record reveals that Zayre did offer to make the underlying records available at its individual stores. SM & R does not deny this but argues that such a process would have been unduly burdensome because it would have required SM & R's counsel to visit hundreds of Zayre stores to examine the records. Such a procedure might very well have been impractical. But SM & R never filed an affidavit under Fed.R.Civ.P. 56(f) requesting a continuance to pursue discovery, or a motion for a protective order under Rule 26(c), or a motion to compel discovery under Rule 37(a), or in any other way ask the district court to require Zayre to make the underlying records more conveniently available before the district court

entered summary judgment. SM & R cannot now complain about the burden that inspecting the underlying records would have imposed. Cf. *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir.1988) (nonmovant cannot raise lack of discovery as grounds for reversing summary judgment on appeal when he took no action in district court to obtain additional discovery time). Since Zayre literally did make the underlying records available, the printouts (if indeed they were summaries) were not inadmissible under Rule 1006.

SM & R's authentication and foundation arguments, however, raise more complicated issues. Campbell's affidavit indicates that whoever prepared it gave little thought to authenticating the printouts or qualifying them as business records. The affidavit states nothing about why Campbell would be familiar with the computer system and data processing procedures that produced the printouts. Zayre has attempted to bolster Campbell's affidavit by emphasizing that he was Zayre's controller, who Zayre claims was "the very individual responsible for maintaining the accuracy of Zayre's accounting records." But the record contains no evidence of Campbell's duties with Zayre, and absent such evidence Campbell's title is meaningless. Not all companies use the same labels for the same functions, and for all we know from the record Zayre could have given the title "controller" to its head of maintenance.

Still, Campbell did testify that he reviewed the printouts and that the printouts accurately reflected the amounts of vacation pay that Zayre had paid on SM & R's account. Campbell also testified that he personally knew about what he testified to. SM & R has not presented any specific facts that call into question Campbell's assertion that he could personally attest to the printouts' accuracy. This is not surprising because, as far as the record shows, SM & R never deposed, or even asked to depose, Campbell before the district court entered summary judgment. Given SM & R's failure to test Campbell's knowledge, perhaps Campbell's affidavit is sufficient to

authenticate the printouts and qualify them as business records (or at least to prevent us from concluding that the district court abused its discretion—the relevant standard for reviewing evidentiary questions, see, e.g., *United States v. Franco*, 874 F.2d 1136 (7th Cir.1989)—in considering the printouts).

We do not reach the authenticity and hearsay arguments that SM & R raises on appeal, however, because there is a fundamental problem with those arguments: SM & R did not raise them in the district court. An evidentiary objection not raised in the district court is waived on appeal, Fed.R.Evid. 103(a)(1); and this rule holds as true for a summary judgment proceeding as it does for a trial. See *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1267–68 (7th Cir.1986); see also 6 *Moore's Federal Practice, supra*, ¶ 56.22[1], at 56–767 (a motion to strike an affidavit "should be precise, *i.e.*, it should state specifically the portions of the affidavit to which objection is being made and the grounds therefor"); cf. *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 946 (7th Cir.1988) (issue not raised in district court in resisting a summary judgment motion is waived on appeal).

SM & R did file a motion to strike Campbell's affidavit and the computer printouts in the district court. That motion raised the same Rule 1006 argument that we have disposed of above. However, the rest of SM & R's argument for striking the affidavit and printouts stated:

> Campbell's affidavit is based on hearsay. No attempt has been made to establish a foundation for the computer printouts which Campbell states are the basis for the invoices as business records (see Rule 803(6) of the Federal Rules of Evidence). Campbell states that he has reviewed the invoices based upon the computer printouts and that they accurately reflect payments for vacation pay. He is not competent to so testify. He was not, as required by Rule 803(6), a participant in a chain in the course of a regularly conducted business activity which produced the printouts; further, the format

of the printouts indicates that the printouts were produced in connection with the present claim against SM & R and could not be so qualified.

SM & R's argument below nowhere mentions Rule 901, or questions the printouts' authenticity, or raises the specific problems concerning authenticity (for example lack of testimony about the data processing procedures) that SM & R raises now. SM & R did question the printouts' qualification as business records but it did not raise the same arguments on these points in the district court as it raises on appeal. An objection that Campbell "is not a participant in a chain in the course of a regularly conducted business activity which produced the printouts" is not the same as an objection that Campbell was not the records' "custodian or an otherwise qualified witness." Rule 803(6) imposes no requirement that a witness be a "participant in a chain ... which produced the printouts." The phrase "other qualified witness" is interpreted broadly; indeed an "otherwise qualified witness" "need not be an employee of the entity so long as he understands the system." 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 803(6)[02], at 803–178 (1988); see, e.g., *Franco*, 874 F.2d at 1139–40. SM & R's objection was not sufficient to fairly alert the district court that SM & R was challenging Campbell's competency to qualify the printouts based upon his lack of knowledge of the system that produced them.

Similarly, the objection that "the format of the printouts indicates that the printouts were produced in connection with the present claim against SM & R" is not the same as an objection that Zayre has not alleged that the printouts were made as a "routine practice." The district court would have been justified in concluding that if the printouts' "format" did not "indicate" that Zayre prepared them only for purposes of this litigation, then SM & R had no further objection to their admission based on whether Zayre produced the printouts as a regular practice of its business, or based on Zayre's motivation for producing the printouts. Since SM & R did not

argue to the district court that it was challenging the printouts because Zayre did not produce them as a regular practice (aside from the argument concerning litigation motivation), it has waived that argument on appeal.[1]

Based on Fed.R.Evid. 103(d) and its accompanying advisory committee note, this court has held that we may consider evidentiary objections a party has not raised in the district court if admitting the evidence below was plain error. *Deppe v. Tripp*, 863 F.2d 1356, 1362 (7th Cir.1988). However, we will find plain error only in exceptional circumstances where an error affects a party's substantial rights and results in a miscarriage of justice. *Id.* Assuming that it was error not to strike Campbell's affidavit and the computer printouts, that error was not plain error. Given that SM & R has presented no specific facts that cast doubt on Campbell's competence to testify as to the printouts' accuracy and authenticity (and, indeed, has never even bothered to depose Campbell to probe his competence), SM & R has not come close to showing that considering the affidavit and printouts affected its substantial rights or caused a miscarriage of justice.[2]

Having affirmed the district court's decision not to strike Campbell's affidavit and the accompanying invoices and printouts, we also conclude that Zayre has met its burden of showing that no genuine issue of material fact existed for trial concerning the amount of reimbursement for vacation pay SM & R owed Zayre. Thus, it was up to SM & R to produce evidence to dispute this amount and show that a genuine issue of fact exists. See *Meyer*, 781 F.2d at 1267.

SM & R produced no evidence specifically disputing Campbell's assertion that the invoices and printouts accurately reflected its debt to Zayre; for example, SM & R produced no evidence to show that Campbell did not know what he was talking about or that the computer improperly computed the amount due. Nor did SM & R produce any evidence to specifically cast doubt on Campbell's credibility. SM & R did, however, submit an affidavit from Maxwell Pohn, its president and CEO. In that affidavit, Pohn stated that the amount sued for, $61,539.40, is more than 50% higher than an estimated "realistic figure" that Campbell had mentioned to Pohn while negotiating the Settlement Agreement.[3] Pohn also stated that an audit that had been made of credits Zayre had previously taken against SM & R revealed a $2,000 error in Zayre's favor.

SM & R asserts that these statements raise a genuine issue concerning the amount due Zayre. We think not. The fact that the final total exceeded an estimate made by Zayre does not show that the final total was inaccurate, especially given that Pohn's own affidavit states that Campbell had stated that SM & R's maximum exposure for vacation pay was more than

---

1.  SM & R does quote *United States v. Sanders*, 749 F.2d 195, 198 (5th Cir.1984) for the proposition that "[c]omputer business records are admissible if ... they are created for motives that tend to assure their accuracy (e.g., not including those prepared for litigation)...." We do not think that this raises the objection SM & R raised below that the printouts' "format" somehow "indicates" that Zayre prepared the printouts solely for this litigation, given that SM & R has not attempted to relate this citation to this case's facts. If SM & R has raised the argument, we reject it. SM & R has not even argued how the printouts' "format" "indicates" Zayre prepared the printouts for this claim. Campbell's affidavit states that the printouts accompanied its billings to SM & R under the settlement agreement, and SM & R has presented no specific facts to refute that claim.

2.  Although based on SM & R's arguments we do not find that the district court erred in admitting the computer printouts, we caution litigants against taking the cursory approach taken in this case to such evidence (which is likely to become increasingly prevalent and important in the future). For a discussion of the foundation necessary to admit computer records, see, e.g., *United States v. Catabran*, 836 F.2d 453, 456–58 (9th Cir.1988); *Croft*, 750 F.2d at 1364–65; and *Sanders*, 749 F.2d at 197–99.

3.  The $61,539 Zayre claimed that SM & R owed included a credit of $43,689 previously paid. Thus, SM & R's total exposure for vacation pay was $105,228. Campbell mentioned to Pohn a "maximum" total exposure of $120,000, and a "realistic" total exposure of $70,000.

$50,000 *greater* than the "realistic figure." Nor does the earlier $2,000 error in Zayre's favor cast sufficient doubt on the accuracy of Zayre's figures to create a genuine issue of fact. Pohn's affidavit does not relate the earlier mistake to the present amount due. For example, Pohn's affidavit presents no facts concerning whether the error resulted from a systemic problem, or facts that in any other way show the likelihood of a mistake occurring again. Pohn's affidavit merely invites speculation that if Zayre made one mistake before, it might have made one again. An invitation to speculate does not create a genuine factual issue. Cf. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("metaphysical doubt" about a material fact does not create a genuine issue). Since Zayre has established the amount that SM & R owes for vacation pay and SM & R has presented no facts to raise a genuine issue concerning that amount, summary judgment was proper for Zayre on the reimbursement claim.

## II.

SM & R also challenges the district court's decision to grant summary judgment on its breach of contract claim against Zayre. The district court held that the contract SM & R sued on was a contract to sell goods, and that the statute of frauds provision in Illinois' version of the Uniform Commercial Code, Ill.Ann.Stat. ch. 26, para. 2–201 (Smith–Hurd 1963) applied to that contract. Section 2–201 states:

(1) Except as otherwise provided in this Section, a contract for the sale of goods for the price of $500 or more is not enforceable ... unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought.... A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

SM & R produced two letters from Zayre's president, Sherman, to SM & R's president and CEO, Pohn (the "Sherman letters"), that SM & R claimed met § 2–201's writing requirement. The Sherman letters summarized discussions between Sherman and Pohn concerning preparations for transferring the jewelry departments' management from SM & R to Zayre. The first letter stated, in pertinent part:

5. Fall Buying for Spring—You [SM & R] have agreed to keep running the business through the end of January just as you have in the past, which includes buying merchandise for Spring at similar quality, cost and retails as you have been historically. Lawler [a Zayre employee] and Solway [an SM & R employee] will work on procedures for segregating the merchandise and purchase orders with the intent that the goods will not be included in the inventory. I am also prepared to finance any LC's [presumably, letters of credit] that you place for Spring goods.

The second letter stated:

The purpose of this letter is to confirm the understanding that we have reached regarding your fall buying activities for merchandise anticipated to be sold during the Spring of 1985.

I understand that Richard Lawler is already working with Gene Chesen and Jack Solway on developing this Spring's merchandising plans which will include starting inventory estimates and anticipated needs thereafter. (Hopefully you will be helping to fine tune these plans with your keen sense of the business.) Although your buying activities should work within these open-to-buy parameters, the actual item selection will be left to your discretion and as long as it fits within the same criteria that you have followed over the past couple of years with respect to styling (modified for fashion changes) quality, retail pricing and markup, Zayre will indemnify and hold you harmless for its salability and shelf life.

If you are inclined to import my portion of the spring goods we will offset your

letter of credit so that you will not be outlaying your cash on our behalf.

The district court held that the Sherman letters were insufficient to meet § 2–201's writing requirement.

SM & R first asserts that it was improper to grant summary judgment on the breach of contract claim because Zayre submitted no affidavits to support its summary judgment motion on that claim. (Zayre did submit the Campbell affidavit but that affidavit addressed only Zayre's reimbursement claim.) This contention is without merit. A party may move for summary judgment "with or without supporting affidavits." Fed.R.Civ.P. 56(a). Zayre's burden was to inform the district court why no genuine issue of material fact existed; in other words, Zayre had to inform the district court why, on the record before it—which at the time Zayre filed its motion consisted only of the pleadings—SM & R could not succeed on its claim. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Zayre discharged this burden by pointing out that SM & R had alleged a contract to sell goods, that the UCC statute of frauds governed the contract, that SM & R had not alleged any writing existed, and that no writing meeting the statute of frauds requirement appeared in the record.

It was proper for Zayre to file its summary judgment motion based solely on the facts that SM & R alleged in its counterclaim. See *Blum v. Morgan Guaranty Trust of New York*, 709 F.2d 1463, 1466 (11th Cir.1983); 6 *Moore's Federal Practice, supra*, ¶ 56.11[2], at 56–109 to 56–110. A summary judgment motion based solely on the complaint (or, as in this case, the counterclaim) is functionally equivalent to a motion to dismiss for failure to state a claim under Rule 12(b)(6). See *id.* at 56–111. Rather than standing on its pleadings, however, SM & R defended against Zayre's motion by submitting materials outside the pleadings: the Sherman letters, and an affidavit by Pohn explaining the alleged contract. This did not mean, however, that Zayre was obliged to submit affidavits or other evidentiary materials of its own. Zayre could, and did, assert that even given the facts now contained in the record—including the letters and affidavit that SM & R submitted—the statute of frauds still prevented SM & R from enforcing the alleged contract as a matter of law. This presented the paradigm summary judgment question: based on the undisputed facts, could SM & R possibly win on its contract claim? Cf. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53 (no genuine factual issue exists where the nonmoving party has failed to make a sufficient showing on an essential element of her case); *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (the standard for granting summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must grant a directed verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict"). If the district court correctly determined that on the undisputed facts SM & R would lose as a matter of law, summary judgment was proper.

Beside raising its procedural complaint, SM & R asserts that the district court's decision to grant summary judgment was incorrect on the merits. SM & R first contends that the contract it alleged was not one to sell goods but was a contract for services, and that § 2–201 does not apply to the contract. See Ill.Ann.Stat. ch. 26, para. 2–201 (UCC Article 2 applies only to transactions in goods). Viewing the facts in the light most favorable to SM & R, the contract here was a "mixed" contract: that is, the contract provided both for the sale of goods (the jewelry) and the provision of services (Pohn using his "keen sense of the business" to select the exact goods). In determining whether Article 2 governs a mixed contract, Illinois courts look to see what the contract's "predominant purpose" is. *Yorke v. B.F. Goodrich Co.*, 130 Ill.App.3d 220, 85 Ill. Dec. 606, 608, 474 N.E.2d 20, 22 (2d Dist. 1985); *WICO Corp. v. Willus Industries*, 567 F.Supp. 352, 355 (N.D.Ill.1983). If the contract's predominant purpose, or "raison

d'etre" is the sale of goods, then it is governed by Article 2. *WICO Corp.*, 567 F.Supp. at 355.

■ We agree with the district court that the contract that SM & R is suing on is predominantly one to sell goods. Although the contract provides that Pohn is to perform certain services for Zayre, these services are essentially the same as those the Master Agreement had already obliged him to perform. The only real difference between the contract SM & R alleged and the Master Agreement was Zayre's alleged obligation to buy jewelry from SM & R at a markup. Indeed, SM & R does not seek damages for the value of the services Pohn performed; it seeks damages for lost profits resulting from Zayre's failure to purchase the goods. Pohn's services were directed at acquiring jewelry to resell to Zayre. That resale was the "heart" of the alleged contract. Cf. *Republic Steel Corp. v. Penn Engineering Corp.*, 785 F.2d 174, 181 (7th Cir.1986) (holding that contract requiring seller to perform engineering services necessary for it to build two steel furnaces was a contract for the sale of goods—the furnaces; the engineering and construction services were incidental to selling the furnaces). Since the predominant purpose of the contract SM & R sued on was the sale of goods, § 2–201's writing requirement applied to the contract.

■ SM & R argues that even if the statute of frauds applies, the Sherman letters satisfy its requirements. To meet § 2–201's requirements, a writing must be sufficient to indicate that a contract to sell goods exists, be signed by the party against whom enforcement is sought, and state a quantity term. See Ill.Ann.Stat. ch. 26, para. 2–201(1); William B. Davenport, Illinois Code Comment to § 2–201, Subsection (1). As the district court noted, it is doubtful whether the Sherman letters even indicate the sales contract that SM & R has alleged. For example, the letters do not even mention that Zayre will purchase jewelry from SM & R, much less purchase it at a markup, and SM & R has not explained how the letters even imply that conclusion. But the major flaw the district court found

that doomed SM & R's attempts to use the Sherman letters to meet the statute of frauds was the letters' lack of a quantity term.

■■ As noted, a writing can fail to state many of an alleged contract's terms and still satisfy § 2–201. However, a writing that does not state a quantity term is not sufficient. *Ray Dancer, Inc. v. DMC Corp.*, 175 Ill.App.3d 997, 125 Ill.Dec. 447, 452, 530 N.E.2d 605, 610 (2d Dist.1988). The writing here does not state any quantity that Zayre agreed to buy from SM & R. SM & R says that this does not matter because the contract was a requirements contract; that is, Zayre agreed to buy all the jewelry it required for its 1985 spring selling season from SM & R. The Illinois UCC specifically approves requirements contracts, see Ill.Ann.Stat. ch. 26, para. 2–306(1), and a writing that states that a buyer's requirements is the quantity to be bought sufficiently states a quantity term under § 2–201. See *Ray Dancer, Inc.*, 125 Ill.Dec. at 452, 530 N.E.2d at 610.

The district court rejected SM & R's argument that its alleged contract with Zayre was a requirements contract. SM & R contends the district court erred. But there are several problems with SM & R's argument on appeal, caused mainly by the paucity of its argument below.

The district court held that an essential element of a requirements contract is the buyer's promise to purchase exclusively from the seller, and that the two Sherman letters contained no promise by Zayre to buy exclusively from SM & R. SM & R argues on appeal that a requirements contract does not require exclusivity. Whether SM & R is correct or not is debatable; many courts have held that requirements contracts did not exist where the buyer did not promise to buy exclusively from the seller. See, e.g., *Propane Industrial, Inc. v. General Motors Corp.*, 429 F.Supp. 214 (W.D.Mo.1977); see also James J. White & Robert S. Summers, 1 *Uniform Commercial Code* § 3–8, at 162–63 n. 1 (3d ed. 1988). This does not necessarily mean that the contract must explicitly state that the buyer will buy exclusively from the seller;

in certain instances, the promise to buy exclusively from the seller can be implied from the contract. See *Propane Industrial,* 429 F.Supp. at 219.

The problem here is that SM & R mentioned nothing about exclusivity in the district court. SM & R's entire argument on requirements contracts stated: "The quantity requirement is satisfied by the references to Zayre's spring season requirements § 2–306 ch. 26." SM & R did not even mention exclusive dealing, much less argue that an exclusive dealing term might not need to be express. Nor did SM & R argue how such a term might be implied from the Sherman letters or from any of the other materials it submitted (for example, by course of dealing as evidenced by Pohn's affidavit). The district court was not required to construct SM & R's argument for it.

Moreover, neither letter explicitly mentions that Zayre was binding itself to buy all its spring 1985 requirements from SM & R, and it is not readily apparent by implication from the letters that Zayre and SM & R had agreed to enter a requirements contract. Pohn's affidavit states that SM & R was to "fill Zayre's requirements for the spring season." But to satisfy § 2–201, the *writing* must indicate that the contract is one for requirements. *Ray Dancer, Inc.,* 125 Ill.Dec. at 452, 530 N.E.2d at 610; see also *Eastern Dental Corp. v. Isaac Masel Co.,* 502 F.Supp. 1354, 1364 (E.D.Pa. 1980). SM & R attempts to explain on appeal how the Sherman letters themselves indicate a requirements contract, but we will not consider that argument because SM & R made no attempt to show the district court how the Sherman letters indicated that Zayre and SM & R had agreed to a requirements contract.

The district court also noted another problem with SM & R's contention that its contract with Zayre was a requirements contract: that contention is inconsistent with the contract that SM & R alleged in its complaint. SM & R alleged in paragraph 16 of its counterclaim that "pursuant to the Agreement and the written direction of Zayre" it purchased spring merchandise

for Zayre. SM & R went on to allege in paragraph 17 that its purchasing personnel "knew that Zayre's direction to purchase was not in sufficient quantity to meet [Zayre's] requirements," so, therefore, "SM & R ordered and paid for additional quantities of Spring Merchandise." As the district court noted, these allegations assumed that Zayre directed SM & R to purchase a specific quantity of merchandise (a quantity that appears nowhere in the Sherman letters). On the surface, it was inconsistent for SM & R to assert both that a requirements contract existed and that Zayre directed it to purchase a certain quantity of jewelry. SM & R did not attempt to explain away this inconsistency in the district court, nor does it do so on appeal.

SM & R finally asserts that even if the Sherman letters did not satisfy § 2–201's writing requirement, the fact that it fully performed all its obligations under the alleged contract makes the statute of frauds inapplicable. The Illinois Appellate Court has recognized such a "full performance" exception to the statute of frauds in the context of UCC § 8–319, Ill. Ann.Stat. ch. 26, para. 8–319 (Smith–Hurd 1974), a statute of frauds provision dealing with securities sales that is almost identical to § 2–201. See *Meyer v. Logue,* 100 Ill. App.3d 1039, 56 Ill.Dec. 707, 427 N.E.2d 1253 (1st Dist.1981). (Illinois amended § 8–319 effective January 14, 1988, but § 8–319 is still almost identical to § 2–201. See Ill.Ann.Stat. ch. 26, para. 8–319 (Smith–Hurd Supp.1989).) But SM & R's argument on this issue founders, as have many of its other arguments, on its inadequate argument in the district court.

SM & R's "argument" on the full performance exception was as follows: "[T]he contract was *wholly performed* by SM & R in the selection, design, and obtaining of services and goods. Subsequently, Zayre 'cut out' SM & R in what would have been its payment for the transaction via a middleman's commission. This performance would take the agreement out of the statute for SM & R had nothing more to do but await collection which would have been

achieved if Zayre had not breached its agreement...." SM & R cited no cases, or any other authority, to support its argument.

From SM & R's argument, the district court surmised that SM & R was relying on the exception to the statute of frauds found at Ill.Ann.Stat. ch. 26, para. 2–201(3)(c). That provision is one of three express exceptions found in § 2–201. It states:

> (3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable
>
> (c) with respect to goods for which payment has been made and accepted or which have been received or accepted....

The district court held that since Zayre had not received or paid for any goods, § 2–201(3)(c) did not apply.

SM & R argues that the district court erred by applying § 2–201(3)(c) rather than the judge-made, non-UCC full performance exception. SM & R, however, has nobody to blame for this but itself. SM & R's full performance argument may be valid under Illinois law, but it is similar to two other arguments that could have also applied in this case: § 2–201(3)(c); and promissory estoppel, see generally John D. Calamari & Joseph M. Perillo, *Contracts*, § 19–48 (3d ed.1987).[4] Since the UCC contains its own exceptions to the statute of frauds, it was

logical for the district court to assume, absent relevant authority, that SM & R was relying on one of those exceptions. The district court's assumption is even more reasonable when one considers that some states consider § 2–201's stated exceptions to be exclusive. See Calamari & Perillo, *supra*, § 19–48, at 844; White & Summers, *supra*, § 2–6, at 95–96. SM & R's argument gave no hint to the district court whether Illinois did or did not recognize nonstatutory exceptions to § 2–201's writing requirement.[5] In short, by stating a general argument that hinted at several relevant exceptions to the statute of frauds while citing no relevant authority to support its argument, SM & R forced the district court to guess which exception it was relying on. SM & R cannot complain now that the district court guessed wrong.

### III.

SM & R finally contends that the district court erred by awarding Zayre prejudgment interest on Zayre's reimbursement claim. We disagree.

Ill.Ann.Stat. ch. 17, para. 6402 provides that creditors shall receive prejudgment interest "for all moneys after they become due on any ... instrument in writing." Interest under this provision is proper if the amount is due in the sense that a debtor-creditor relationship has come into being and if the amount due is fixed or readily ascertainable by calculation or com-

---

**4.** SM & R made a passing reference to promissory estoppel in its brief in the district court but the district court did not consider estoppel because that reference was insufficient to demonstrate that SM & R was actually pressing the issue. SM & R does not challenge that decision on appeal. One may wonder whether the full performance doctrine and estoppel are really different doctrines. *See,* for instance, *Meyer,* 56 Ill.Dec. at 711, 427 N.E.2d at 1257. In any event, it is evident that SM & R argued them as separate doctrines below; its reference to full performance appeared several pages after its reference to estoppel, and it did not cite any cases relating to estoppel or even relate its discussion of full performance to its discussion of estoppel. Given this, estoppel is not before this court.

**5.** SM & R did cite one case, *Grundy County Nat'l Bank v. Westfall,* 13 Ill.App.3d 839, 301 N.E.2d

28 (3d Dist.1973), that held that a party's substantial performance could take a contract outside the statute of frauds. That case, however, was not a UCC case and could not have told the district court how Illinois would treat nonstatutory exceptions to § 2–201. The court dismissed that case as irrelevant to cases under the UCC. SM & R also cited a case, *R.S. Bennett & Co. v. Economy Mechanical Industries,* 606 F.2d 182 (7th Cir.1979) that held that Illinois law would apply promissory estoppel in cases governed by § 2–201. However, SM & R cited this case in its passing reference to estoppel, and SM & R does not complain that the district court erred by refusing to consider its estoppel argument. Thus, SM & R cannot rely on its citation to *R.S. Bennett* to alert the district court to the applicability of non-statutory exceptions to § 2–201 in Illinois.

putation. See *Advance Mortgage Corp. v. Concordia Mutual Life,* 135 Ill.App.3d 477, 90 Ill.Dec. 225, 231, 481 N.E.2d 1025, 1031 (1st Dist.1985).

SM & R does not dispute that it owed Zayre money or that any amount it owed to Zayre was due on an "instrument in writing." SM & R does dispute that the amount due was not readily ascertainable by computation or calculation. According to SM & R, the purpose for requiring that the amount be fixed or readily ascertainable is to allow the debtor to tender the amount due to stop interest from running. See *Sterling–Midland Coal Co. v. Great Lakes Coal,* 266 Ill.App. 46 (1932). SM & R argues that the amount due was not readily ascertainable because it did not have the documents underlying the amounts stated on Zayre's invoices and computer printouts, and could not have obtained those documents without traversing the country to visit the various Zayre stores in which they were located. Therefore, SM & R claims that it was never in any position to acknowledge and tender the amount due to stop the interest from running.

We reject SM & R's argument for several reasons. For one thing (and this is beginning to sound like a broken record), SM & R never argued in the district court about the purpose for damages being readily ascertainable, nor did it cite any authority to the court relating that requirement to the ability to tender. (In fact, SM & R cited no authority at all in the district court regarding the general subject of prejudgment interest.) Moreover, SM & R places undue emphasis on the *ease* of calculation; as this court has noted, however, under Illinois law, "if the amount of a claim can be ascertained, or is capable of ascertainment by mere calculation or computation, it is liquidated; if judgment, discretion, or opinion, as distinguished from calculation or computation is required to determine the amount of the claim, it is unliquidated."

*First National Bank Co. v. Insurance Co. of North America,* 606 F.2d 760, 769–70 (7th Cir.1979). Here, no judgment, discretion, or opinion was required to determine the amount due; as far as the record before us shows, calculating that amount was just a matter of adding together the vacation payments Zayre made to jewelry department employees during the relevant time period.[6] The fact that this information was to be found in voluminous data located across the country does not make the amount any less capable of ascertaining by computation. Finally, the fact that SM & R presented no facts to dispute the amount, and that no genuine issue concerning the amount exists, indicates that the amount was indeed ascertainable, if indeed not actually fixed.

Courts traditionally construed prejudgment interest statutes narrowly, emphasizing the contract breaker's ability to stop interest from running by tendering the amount due in court. But the recent trend has been to emphasize that prejudgment interest is necessary to give winning plaintiffs fuller compensation for their injuries; thus, courts have relaxed somewhat the requirement that the amount be readily ascertainable at the time of the breach. See *Empire Gas Corp. v. American Bakeries Co.,* 840 F.2d 1333, 1342 (7th Cir. 1988). By failing to pay the invoices when due, SM & R deprived Zayre of money that it was rightfully entitled to. Prejudgment interest was necessary to compensate Zayre as fully as possible for its loss. The district court's decision to award prejudgment interest to Zayre was proper.

### IV.

For the reasons stated above, we AFFIRM the district court's judgment.

AFFIRMED.

---

6. SM & R asserts in passing that questions concerning jewelry department employee identity, longevity of service, and eligibility for vacation pay are still unanswered. SM & R cites no record support for this assertion, and has not even raised it as a ground for reversing the summary judgment. And (here we go again), SM & R never raised this argument in the district court.