**U.S. EQUAL EMPLOYMENT OP-PORTUNITY COMMISSION,**

Plaintiff–Appellee,

and

**Randall Wessel, as personal representative of Charles Wessel, Plaintiff–Appellee, Cross–Appellant,**

v.

**AIC SECURITY INVESTIGATIONS, LTD., and Ruth Vrdolyak, Defendants–Appellants, Cross–Appellees.**

Nos. 93–3839, 94–1018, 94–2895 and 94–3089.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 7, 1995.

Decided May 22, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied June 28, 1995.

1278

Gail S. Coleman (argued), Gwendolyn Young Reams, Carolyn L. Wheeler, James R. Neely, Jr., E.E.O.C., Robert E. Williams, Douglas S. McDowell, McGuiness & Williams, Washington, DC, for E.E.O.C.

Deborah M. Regan, Edward M. Glennon (argued), David A. Allgeyer, Theresa M. Herzog, Lindquist & Vennum, Minneapolis, MN, for Randall Wessel.

William J. Harte (argued), William T. Rodeghier, Chicago, IL, Charles W. Pautsch, James B. Sherman, Frank A. Gumina, Brian A. Price, Wessels & Pautsch, Milwaukee, WI, Joan M. Mannix, Harte & Associates, Chicago, IL, for AIC Security Investigations, Ltd., Ruth Vrdolyak.

Before BAUER, COFFEY, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Charles Wessel died of brain and lung cancer. While he was ill, his supervisor fired him. Before he died, the Equal Employment Opportunity Commission (EEOC) and Wessel sued his employer and his supervisor, charging that they had violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111 *et seq.* A jury found for the EEOC and Wessel and awarded Wessel $572,000 in back pay, compensatory damages, and punitive damages. This multi-faceted appeal requires us to examine issues ranging from individual liability under the ADA to the district court's evidentiary admissions to the

proper award of attorney's fees. We affirm in part and reverse in part.

## I. Background

AIC Security Investigations, Ltd., (AIC), provided security guards for residential and commercial property in the Chicago area. It employed about 300 people. AIC was a wholly-owned subsidiary of AIC International, Ltd., which was owned and run for many years by Victor Vrdolyak. In 1986, Victor Vrdolyak hired Charles Wessel as executive director of AIC, at that time the top management position.

In June 1987, Wessel learned he had lung cancer. Over the following five years he underwent a series of surgeries and treatments, including radiation and chemotherapy. In April 1992, Wessel was diagnosed with inoperable metastatic brain cancer, a terminal illness. Between 1987 and 1992, Wessel suffered a variety of effects from his cancer and treatment, including shortness of breath from having parts of his lungs removed, nausea from radiation and chemotherapy, and somewhat reduced memory capacity due to the effects of brain tumors. He missed work at times, but he continued his employment essentially full-time.

In July 1992, Victor Vrdolyak's wife, Ruth Vrdolyak (the Vrdolyak of this case), took over ownership as sole shareholder of AIC and AIC International, following the death of her husband. She also began operating AIC on a day-to-day basis. Vrdolyak knew that Wessel was ill, and, on July 29, 1992, she fired him.

Wessel filed a complaint with the EEOC. On November 5, 1992, the EEOC sued AIC and Ruth Vrdolyak, alleging violation of the ADA; Wessel intervened as a plaintiff. After a nine-day trial, a jury found that AIC and Vrdolyak had violated the ADA. The jury awarded $22,000 in back pay, $50,000 in compensatory damages, $250,000 in punitive damages against AIC, and $250,000 in punitive damages against Vrdolyak.

Post-trial motions hammered out the final disposition of the case. The district court granted injunctive relief against AIC, ordering a variety of measures to prevent future discrimination. The district court ordered AIC to pay the $22,000 back pay award, plus interest, and the court further ruled that AIC and Vrdolyak were jointly and severally liable for the $50,000 in compensatory damages.

As to the punitive damages, the court noted that 42 U.S.C. § 1981a(b) caps at $200,000 the total amount of compensatory and punitive damages that can be awarded in favor of one plaintiff against a defendant of AIC's size, although the statute forbids the court to inform the jury of that limit. In addition, the district court found that $250,000 per defendant in punitive damages was excessive. For these two reasons, the district court reduced the total award of punitive damages to $75,000 each for Vrdolyak and AIC, thus placing the total award at the maximum amount allowable, $200,000. The district court made AIC and Vrdolyak severally liable for their shares of the punitive damages.

## II. Analysis

### A. Vrdolyak's Liability As an Individual

■ Vrdolyak argues that, as an individual, she cannot be sued under the ADA. Vrdolyak made this same argument to the district court, which rejected it, siding instead with the EEOC's and Wessel's opposite interpretation of the statute. However, we join analogous decisions of our sister Circuits in holding that individuals who do not independently meet the ADA's definition of "employer" cannot be held liable under the ADA. This is a pure question of law; we review the district court's disposition of it *de novo. Pilditch v. Board of Educ.*, 3 F.3d 1113, 1115 (7th Cir.1993).

The ADA forbids discrimination by any "covered entity," defined as "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. §§ 12112(a); 12111(2). "Employer" is "a person engaged in an industry affecting commerce who has 15 or more employees ... and any agent of such person." 42 U.S.C. § 12111(5)(A).

The ADA's definition of "employer" mirrors the definitions of "employer" in Title VII of the Civil Rights Act of 1964 and in the

Age Discrimination in Employment Act (ADEA).[1]  *See* 42 U.S.C. § 2000e(b); 29 U.S.C. § 630(b).  Courts routinely apply arguments regarding individual liability to all three statutes interchangeably.  Therefore, we will use other courts' interpretations of Title VII and the ADEA to help us in our decision.  *See Miller v. Maxwell's Int'l Inc.,* 991 F.2d 583, 587 (9th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994); *Jendusa v. Cancer Treatment Centers of America, Inc.,* 868 F.Supp. 1006, 1008 n. 2 (N.D.Ill.1994); *see also DeLuca v. Winer Industries, Inc.,* 53 F.3d 793 (7th Cir.1995) (approving use in the ADA context of burden-shifting method of proof developed under Title VII and the ADEA).

Numerous district court decisions in this Circuit have addressed the question of individual liability under the ADA, Title VII, and the ADEA.[2]  *Compare Hudson v. Soft Sheen Products, Inc.,* 873 F.Supp. 132 (N.D.Ill.1995) (rejecting individual liability under Title VII) *and Johnson v. Northern Indiana Public Serv. Co.,* 844 F.Supp. 466 (N.D.Ind.1994) (same) *with Jendusa,* 868 F.Supp. 1006 (recognizing individual liability under the ADA) *and Vakharia v. Swedish Covenant*

*Hosp.,* 824 F.Supp. 769 (N.D.Ill.1993) (recognizing individual liability under Title VII and the ADEA).  We, however, have not ruled on the issue.[3]

While no Circuit has directly confronted the question of individual liability under the ADA, five Circuits have explicitly addressed individual liability under Title VII and the ADEA.  Four have rejected individual liability.  *Smith v. Lomax,* 45 F.3d 402, 403–04 & n. 4 (11th Cir.1995) (Title VII and ADEA); *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 510 (4th Cir.) (ADEA), *cert. denied,* — U.S. ——, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994); *Grant v. Lone Star Co.,* 21 F.3d 649, 651–53 (5th Cir.) (Title VII), *cert. denied,* — U.S. ——, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994); *Miller,* 991 F.2d at 587–88 (Title VII and ADEA); *see also Lenhardt v. Basic Inst. of Tech.,* 55 F.3d 377 (8th Cir.1995) (holding that no individual liability exists under Missouri statute similar to the ADA).[4]  One Circuit has recognized individual liability.  *Jones v. Continental Corp.,* 789 F.2d 1225, 1231 (6th Cir.1986) (recognizing in passing individual liability under Title VII).  As we

1. Interpretation of the ADEA is sometimes different from interpretation of Title VII and the ADA, because the ADEA incorporated some provisions of the Fair Labor Standards Act (FLSA), which in some instances make it easier for plaintiffs to recover.  However, the ADEA does not incorporate the FLSA's definition of "employer"; the ADEA's definition is instead essentially identical to Title VII's.  *Miller v. Maxwell's Int'l Inc.,* 991 F.2d 583, 588 n. 3 (9th Cir.1993).  For the question we face today, therefore, the ADEA is interchangeable with Title VII.

2. We use "individual liability" to mean the liability of individuals who do not otherwise meet the statutory definition of employer.  For example, no party disputes that a sole proprietor who employs more than fifteen people in his business would be liable as an "employer" under the ADA, even though not liable in his purely individual capacity.  We address only personal capacity liability, which is sometimes called "supervisor liability" because that is the most common situation in which the question arises.

3. We have previously recognized this issue but we have never been obliged to address it directly.  *Compare DeLuca,* 53 F.3d at 796 (noting that parties did not dispute district court's finding that individual defendants were not personally

liable under the ADA) *and Huebschen v. Dept. of Health & Social Servs.,* 716 F.2d 1167, 1170 (7th Cir.1983) (noting parties' agreement that an individual did not meet Title VII's definition of "employer") *with Price v. Marshall Erdman & Assoc.,* 966 F.2d 320, 324 (7th Cir.1992) (upholding ADEA award against employer and supervisor where parties did not dispute individual liability) *and Shager v. Upjohn Co.,* 913 F.2d 398, 404 (7th Cir.1990) (suggesting possibility that plaintiff might have been able to sue supervisor individually under Title VII) *and Gaddy v. Abex Corp.,* 884 F.2d 312, 318–19 (7th Cir.1989) (upholding Title VII award where parties did not dispute individual liability).

4. *Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir.1993), is not to the contrary.  In *Sauers,* the court limited the individual defendant's liability to his official, strictly representative capacity, which is simply one method of bringing suit against the employer and is distinct from a personal capacity suit.  *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991).  *Sauers* therefore aligned the Tenth Circuit with the majority rule on individual liability.  *But see Ball v. Renner,* 54 F.3d 664 (10th Cir.1995) (arguing that individual liability under Title VII is an "open question" in the Tenth Circuit).

detail below, we find the more recent and more detailed decisions persuasive.

The EEOC and Wessel, fighting against the weight of authority, rely primarily on their own "plain language" interpretation of the ADA's definition of "employer." They argue that because "employer" is defined to include "a person ... and any agent of such person," and Vrdolyak as president of AIC is an agent of AIC, she must be liable. While this reading has some surface appeal, *Miller,* 991 F.2d at 587, upon closer examination that appeal is really an illusion. Contrary to the EEOC's and Wessel's argument, the actual reason for the "and any agent" language in the definition of "employer" was to ensure that courts would impose *respondeat superior* liability upon employers for the acts of their agents. *Birkbeck,* 30 F.3d at 510; *Miller,* 991 F.2d at 587.

That conclusion accords with the rest of the structure of the ADA, Title VII, and the ADEA. Those statutes all limit employer liability to employers with either fifteen or twenty, or more, employees. That limitation struck a balance between the goal of stamping out all discrimination and the goal of protecting small entities from the hardship of litigating discrimination claims. *See Miller,* 991 F.2d at 587 ("If Congress decided to protect small entities with limited resources from liability, it is inconceivable that Congress intended to allow civil liability to run against individual employees."); *Birkbeck,* 30 F.3d at 510 ("The purpose of this provision can only be to reduce the burden of the ADEA on small businesses."). The EEOC's interpretation upsets that balance and distorts the statutory framework.

The original design of damage awards under the ADA, Title VII, and the ADEA buttresses our conclusion. Until 1991, a successful plaintiff could recover only back pay and equitable relief such as reinstatement. Those types of remedies typically are only obtainable from an employing entity, not

from a mere individual. *Grant,* 21 F.3d at 653. That arrangement suggests that Congress did not contemplate individual liability when it originally passed the relevant statutes. *Id.*

The EEOC and Wessel respond that the Civil Rights Act of 1991, 42 U.S.C. § 1981a, negates that conclusion. That Act allowed successful plaintiffs under Title VII and the ADA to obtain compensatory and punitive damages in addition to the already available types of remedies.[5] The EEOC and Wessel note, correctly, that compensatory and punitive damages are typical remedies obtainable from individuals. They contend that Congress must have meant to imply individual liability by passing the 1991 Act.

However, we conclude the opposite, namely that the Civil Rights Act of 1991 further shows that Congress never intended individual liability. First, at the time it defined "employer" in the ADA, Title VII, and the ADEA, Congress granted only remedies that an employing entity, not an individual, could provide. It is a long stretch to conclude that Congress silently intended to abruptly change its earlier vision through an amendment to the remedial portions of the statute alone.

Second, although it allowed new types of damages, the Civil Rights Act of 1991 limited the amount of monetary recovery under Title VII and the ADA, by placing caps on the total amount of compensatory and punitive damages that could be awarded to any complaining party. Congress enacted a sliding scale of caps, increasing the possible award as the number of employees of a liable party increased. The lowest cap is $50,000, "in the case of a respondent who has more than 14 but fewer than 101 employees." 42 U.S.C. § 1981a(b)(3)(A). Congress enacted no cap for individuals. That omission implies it did not consider individuals liable.[6] *See Miller,* 991 F.2d at 587 n. 2.

---

5. Although the ADA became effective after the Civil Rights Act of 1991 went into effect, the ADA was passed before the Act.

6. Faced with this argument, Wessel contends that the logical conclusion instead is that Congress intended no cap at all on individual liabili-

ty, but rather that individuals be liable for any amount, be that $5 or $5 billion. Granted, that is a possible interpretation, but we think it highly improbable.

Lacking the support of the structure arguments, the EEOC and Wessel bring forth a short parade of horribles. They say that individual liability is essential to dissuade supervisors and other individuals from violating the law. They argue that the paramount consideration is stamping out discrimination and that through the loophole of no individual liability will pour a flood of unpunished and undeterrable discrimination.[7]

■ We reject that Chicken Little-esque argument. The employing entity is still liable, and that entity and its managers have the proper incentives to adequately discipline wayward employees, as well as to instruct and train employees to avoid actions that might impose liability. *See Miller,* 991 F.2d at 588.[8] It is true that increasing the number of potentially liable defendants would increase deterrence, as businesses put more resources into avoiding liability and plaintiffs saw more potentially liable parties and had a greater incentive to sue in marginal cases.[9] But Congress has struck a balance between deterrence and societal cost, and we will not upset that balance. We do not doubt that the employment discrimination statutes have broad remedial purposes and should be interpreted liberally, but that cannot trump the narrow, focused conclusion we draw from the structure and logic of the statutes. A liberal construction does not mean one that flies in the face of the structure of the statute. *See Hudson,* 873 F.Supp. at 136 ("[W]e cannot reverse course in the face of some vague, aspirational broad intent. Congress had lofty goals but provided limited means for reaching those goals. Individual liability was not one of them."). We hold that individuals who do not otherwise meet the statutory definition of "employer" cannot be liable under the ADA.[10] We conclude that the district court erred in not dismissing Vrdolyak as a defendant.[11]

**B. Admission of Wessel's Videotaped Deposition**

■ In November 1992, Wessel made a videotaped deposition, to preserve his testimony in case he died or was otherwise unable to testify. At trial, the district court admitted the videotape into evidence, even though Wessel did testify. AIC and Vrdolyak argued after the verdict that the district court erred by admitting the videotape. In their post-trial motions, they relied on FED. R.CIV.P. 32(a)(3)(E), which provides that the deposition of an available witness may be used as evidence only when "exceptional circumstances" exist. The district court rejected their argument as forfeited because although AIC and Vrdolyak objected at the time of admission, they brought up Rule 32 only after trial, rather than objecting on that ground when the videotape was tendered.

AIC and Vrdolyak make the same Rule 32–based argument to us, although they con-

---

7. This argument, and its variants, are not uncommon. *See, e.g., Jendusa,* 868 F.Supp. at 1010–11.

8. Where the individual owns all or a significant share of the employing entity, he will be disciplined directly by the financial loss he must absorb, whether or not there is individual liability.

9. Wessel and the EEOC argue that sometimes the employer may be bankrupt or otherwise judgment-proof, so individual liability will be the only possible way a plaintiff can recover. While true, that is not enough for us to upset the structure Congress has set up.

10. We emphasize that our holding only applies directly to the ADA, though it obviously affects the resolution of the very similar questions under Title VII and the ADEA. *See Birkbeck,* 30 F.3d at 510 n. 1 (noting question of non-delegable personnel decisions under Title VII).

11. The EEOC also argues that even if individuals cannot be liable under the ADA, Vrdolyak can somehow be liable as AIC's "alter ego." However, this argument is forfeited because it was not raised before the district court. *Citizens Ins. Co. v. Barton,* 39 F.3d 826, 828 (7th Cir.1994). The EEOC never made any actual alter ego arguments below. Instead, the EEOC bases its appeal on the fact that during the debate in the district court about individual liability, the EEOC mentioned, by name only, an unpublished district court case. As it happens, that case discussed no alter ego arguments, and the EEOC's mentioning a case with a theory arguably buried in it is hardly adequate to preserve an issue. In any case, we see no good reason why it should make any difference for our analysis whether Vrdolyak was AIC's alter ego. She might be effectively liable if the corporate veil were pierced, and as sole shareholder she will necessarily absorb the pinch from AIC's liability, but as to her individual capacity liability it does not matter even if she was AIC's alter ego.

cede that we review only for plain error because of their earlier forfeiture. Plain error exists "only in exceptional circumstances where an error affects a party's substantive rights and results in a miscarriage of justice." *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1151 (7th Cir.1989).

As the district court noted when it denied AIC's and Vrdolyak's post-trial motions, the videotape was not useless duplicative testimony. It provided demonstrative evidence of Wessel's mental and physical condition soon after his firing, such as his ability to communicate with others. Wessel's condition had deteriorated dramatically by the time he testified, so the tape was evidence that would have allowed the jury to infer that Wessel was still able to adequately perform his job when he was fired, an issue that AIC and Vrdolyak hotly disputed. Furthermore, the district court limited any possible prejudice by restricting the plaintiffs' direct examination of Wessel at trial, while allowing unlimited cross-examination by AIC and Vrdolyak. Such precautions restored any skewing of the balance resulting from the videotape's admission. We see no plain error.

## C. Jury Instructions

■ AIC and Vrdolyak contend that the district court erroneously rejected two jury instructions they proposed. Our review is limited. *Maltby v. Winston*, 36 F.3d 548, 560 (7th Cir.1994). We look first at whether the instruction misstates or insufficiently states the law. If it does, we determine if the error prejudiced one of the parties. *Id.* We do not award a new trial unless, "considering all the instructions, the evidence and the arguments, it appears that the jury was misled and its understanding of the issues was seriously affected to the prejudice of the complaining party." *McGeshick v. Choucair*, 9 F.3d 1229, 1232 (7th Cir.1993) (internal quotation marks and ellipses omitted).

■ The first rejected instruction involved AIC's "direct threat" defense. AIC and Vrdolyak maintained that Wessel was fired because his allegedly unsafe driving posed a threat to workplace safety. 42 U.S.C. § 12113 provides:

(a) It may be a defense to a charge of discrimination under this Act that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this title.

(b) The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

The ADA defines "direct threat" as "a significant risk to the health or safety of others." 42 U.S.C. § 12111(3).

Therefore, any defense based on a qualification standard that adversely affects the disabled must be consistent with business necessity. It would seem that a requirement that employees not pose a significant safety threat in the workplace would obviously be consistent with business necessity: a safe workplace is a paradigmatic necessity of operating a business. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1119 (11th Cir.1993) (holding that protecting employees from workplace hazards is a "business necessity" under Title VII). The EEOC originally agreed: while the jury instruction it tendered said nothing about business necessity, it made the expected inquiries, *i.e.*, whether the threat Wessel posed was actually significant, and if a reasonable accommodation was possible and had been offered. Moreover, AIC's and Vrdolyak's tendered instruction was essentially identical to the one the EEOC proposed.

So why the debate about the instruction? The district court gave the jury the following direct threat instruction, slightly different from either instruction originally tendered by the parties:

It is the defendants' defense that Charles Wessel posed a threat to the health and safety of himself or others in the workplace.

You may find that Charles Wessel posed a direct threat only if the defendants have

proven by a preponderance of the evidence that, more likely than not, Charles Wessel *in the performance of an essential function of his job* posed a significant or substantial harm to himself or others in the workplace that could not be eliminated or reduced by a reasonable accommodation. (emphasis added).

The limitation of the defense to "in the performance of an essential function of his job" was added at the EEOC's insistence during the jury instruction conference. AIC and Vrdolyak objected, because if the jury determined that driving was not an essential function of Wessel's job, it could not rationally find that Wessel posed a direct threat. The district court, however, after some debate added the contested language. It apparently thought that the only effect of the addition would be to reinforce the principle that any threat had to be significant for the defense to succeed. When denying post-trial motions, the district court further reasoned that AIC's alternate version of the defense would invite abuse of the ADA. The court thought that it would be "absurd" to allow employers to define jobs to include the performance of non-essential functions and to then permit the employer to fire an employee for being unable to safely perform those non-essential functions.

■ However, another mechanism of the ADA eliminates the possibility of such abuse. Even for employees who do pose a direct threat, an employer must make reasonable accommodations. 42 U.S.C. § 12113(a). The ADA defines "reasonable accommodation" to include restructuring a job, such as by removing non-essential functions from the job. *See* 42 U.S.C. § 12111(9)(B); *see also* 29 C.F.R. § 1630.2(*o*); *see generally Vande Zande v. State of Wisconsin Dept. of Admin.*, 44 F.3d 538 (7th Cir.1995). Thus, an employer could not fire an employee as the district court hypothesized; instead, the employer would simply have to remove the non-essential functions from the employee's job, thereby eliminating the danger.

To persuade the district court to add the disputed language, the EEOC relied on the interpretive guidelines of the regulations issued pursuant to the ADA. "If a test or

other selection criterion excludes an individual with a disability because of the disability and does not relate to the essential functions of a job it is not consistent with business necessity." 29 C.F.R. § 1630, Appendix; *see also* 29 C.F.R. § 1630.2(r). That language is not directed at the direct threat defense in particular, but rather to any type of qualification standard or selection criterion. It is just a way of re-stating the point the district court missed: that any non-essential part of a job can usually be removed through a reasonable accommodation, such as a change in the job definition or a restructuring of the workplace.

Therefore, the language the district court added was a proper inquiry taken from its proper context. The instruction already required the jury to consider reasonable accommodations. An examination of the essential functions of the job is a necessary subset of the inquiry into reasonable accommodations; another jury instruction already required the jury to consider reasonable accommodations in the light of essential functions.

■ With this in mind, it is evident that the district court erred in phrasing this jury instruction. The instruction required that the jury consider whether Wessel posed a danger to workplace safety in the performance of an essential function of his job. That inquiry was superfluous, but instead of being mere surplusage, the context invited the jury to consider as dispositive whether Wessel had to drive to accomplish his job. "Performance," in the context of the instruction and arguments, clearly implied Wessel's driving. The inquiry about essential functions should have been confined as a subset of the question of accommodation; it should not have appeared in this instruction at all.

However, we do not think that this relatively minor error prejudiced AIC and Vrdolyak. First, if the jury did find that driving was an essential function, the net effect of the erroneous language was zero. Given that Wessel drove to and from work and frequently drove to meetings, the jury likely made that determination (although the general verdict form prevents us from knowing for

sure). Second, very little evidence supported the theory that Vrdolyak fired Wessel because she thought he was a direct threat to safety. On the contrary, the jury heard that she admitted to a *Chicago Tribune* reporter that she fired him because he was ill, saying nothing about any potential threat. In fact, Vrdolyak even testified that Wessel had not been fired, but had voluntarily retired; her testimony in general was fluid, to put it charitably. Moreover, the sizeable award of punitive damages shows that the jury thought Vrdolyak acted in bad faith in firing Wessel, and the success of the direct threat defense depended on a finding of good faith. Third, nobody at AIC ever forbade Wessel to drive, making it unlikely that he was really perceived as a significant threat. In the overall context of the instruction and the trial, we do not think AIC and Vrdolyak were prejudiced by the erroneous instruction.

■ The second rejected instruction involved a "good faith accommodation" defense. The district court rejected that defense as totally inapplicable, and we agree. AIC and Vrdolyak rely on 42 U.S.C. § 1981a(a)(3), which provides:

> In cases where a discriminatory practice involves the provision of a reasonable accommodation pursuant to section 102(b)(5) of the [ADA] [42 U.S.C. § 12112(b)(5) ] ... damages may not be awarded under this section where the covered entity demonstrates good faith efforts ... to identify and make a reasonable accommodation. ...

But Wessel did not base his claim of discrimination on an alleged refusal by AIC to provide a reasonable accommodation under 42 U.S.C. § 12112(b)(5). Instead, Wessel claimed discriminatory firing under § 12112(b)(1).[12] Because 42 U.S.C. § 1981a(a)(3) limits the defense to those actions brought under 42 U.S.C. § 12112(b)(5),

the district court correctly rejected the proposed instruction.

## D. Damages

### 1. Compensatory Damages

■ AIC and Vrdolyak argue that although the jury's finding of ADA liability means that the award of some compensatory damages was appropriate, $50,000 for emotional damages was excessive. The district court upheld the damage award against post-trial challenge. We review the district court's refusal to grant a new trial on the grounds of excessive damages for an abuse of discretion. *Ross v. Black & Decker, Inc.,* 977 F.2d 1178, 1189 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1274, 122 L.Ed.2d 669 (1993).

■ When reviewing a compensatory damages award, we make three inquiries: whether the award is "monstrously excessive"; whether there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas;[13] and whether the award is roughly comparable to awards made in similar cases. *Littlefield v. McGuffey,* 954 F.2d 1337, 1348 (7th Cir.1992); *Fleming v. County of Kane,* 898 F.2d 553, 561 (7th Cir.1990).

The district court found that there was a rational connection between the evidence and the damage award, and we agree. Wessel claimed only emotional damages: basically depression, rage and fear resulting from his sudden firing. As the district court noted, Wessel's work was a very large part of his life. He took almost no vacations, and his son testified that he sometimes even put his company above his family. Coupled with that background, the evidence showed that Wessel's wrongful firing was emotionally wrenching, even though he underwent no formal psychological treatment. He was cut off from one of the major defining aspects of

---

12. As already discussed, reasonable accommodations were an issue at the trial, but Wessel's claim was not that AIC and Vrdolyak were liable for failing to provide reasonable accommodations.

13. "Monstrously excessive" is, of course, a rather vague standard for review. We have suggested

that perhaps it should be folded into the rationality inquiry. *See Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d 963, 971 (7th Cir.1983). The $50,000 awarded in this case is, however, neither monstrous nor irrational, so we see no reason to fully separate or to join the inquiries.

his life, and he was forced to watch his family suffer emotionally and financially as well. As the district court pointed out, the emotional burden on a person dying of cancer, perceiving himself as unable to adequately provide for his family, is considerably greater than that suffered by the ordinary victim of a wrongful discharge.

We have previously upheld numerous similar awards.[14] *See Fleming*, 898 F.2d at 561–62 (upholding award of $40,000 under 42 U.S.C. § 1983 for emotional distress resulting from firing); *Webb v. City of Chester*, 813 F.2d 824, 836–37 (7th Cir.1987) (reviewing cases and concluding that cases upholding damages for claims under 42 U.S.C. § 1983 resulting from illegitimate firings "ranged from a low of $500 to a high of over $50,-000"); *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1313 (7th Cir.1985) (holding that $35,000 was an appropriate award for emotional harm suffered as a result of discriminatory treatment and termination). We also note that those awards were several years ago, and thus the current value of those awards is considerably greater. Comparability of awards must be adjusted for the changing value of money over time. Ultimately, it may be that Wessel did not really deserve as much as $50,000, but that is not the question. The question is whether that award was grossly excessive, and it was not.

### 2. Punitive Damages

■ AIC and Vrdolyak maintain that there was insufficient evidence to support an award of punitive damages. However, they have forfeited that argument. AIC and Vrdolyak concede that although after the verdict they filed a motion for judgment as a matter of law under Rule 50(b), arguing that there was insufficient evidence to support any award of punitive damages, they had not

earlier moved for judgment as a matter of law at the close of the evidence pursuant to Rule 50(a) (what used to be called a motion for a directed verdict). That failure kills their argument. "It is well established in this Circuit that the sufficiency of the evidence supporting jury submission of a case or the jury's findings is not reviewable on appeal unless the party seeking review has made a timely motion for a directed verdict in the trial court." *Hudak v. Jepsen*, 982 F.2d 249, 250 (7th Cir.1992).

Refusing to concede that they are barred, AIC and Vrdolyak try to make use of a perceived escape hatch. They point out that in a few instances we have allowed something other than a motion for a directed verdict at the close of evidence to preserve the objection.[15] They cite *Warlick v. Cross*, 969 F.2d 303, 308 (7th Cir.1992), where we allowed a motion for a Rule 50(a) directed verdict *prior* to the close of all the evidence to preserve the issue for appellate review. *Warlick* relied on *Benson v. Allphin*, 786 F.2d 268, 274–75 (7th Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986), where we came to a similar conclusion. As it happens, the *Benson* exception probably only applied to appellate review of pure questions of law, *see Kladis v. Brezek*, 823 F.2d 1014, 1017 (7th Cir.1987), which sufficiency of the evidence is not, but AIC and Vrdolyak's argument fails for a more basic reason: that the Rule 50 we parsed in *Benson* is not the Rule 50 we use today.

The 1991 amendments to Rule 50 erased the *Benson* end-run around the Rule. Rule 50 now specifies that only a proper Rule 50(a) motion preserves the issue for later review, and that a proper motion is one that is explicitly a motion for judgment as a matter of law. "Such a motion shall specify the

---

**14.** This is the first damages award under the ADA we have reviewed. However, cases involving termination found wrongful under other civil rights laws are, for this purpose, just as useful as cases involving the ADA would be.

**15.** AIC and Vrdolyak also want us to recognize an exception to our general refusal to review forfeited sufficiency of the evidence arguments, where "plain error" existed or "manifest injustice" would otherwise result. We have several times mentioned this exception, generally with

faint disapproval, but we have never adopted it. *See, e.g., Hudak*, 982 F.2d at 250–51. It might not make much sense to adopt it, especially given that the suggested inquiry is nearly indistinguishable from our general sufficiency of the evidence inquiry. We might as well not have the forfeiture rule. Regardless, we do not finally reject the exception, but merely note that if we were to accept it, we would certainly see no plain error or manifest injustice in this case.

judgment sought and the law and the facts on which the moving party is entitled to the judgment." Rule 50(a)(2). The Advisory Committee notes to the 1991 amendment of Rule 50(a)(2) state, "The revision thus alters the result in cases in which courts have used various techniques to avoid the requirement that a motion for a directed verdict be made as a predicate to a motion for judgment notwithstanding the verdict. *E.g., Benson v. Allphin....*" AIC and Vrdolyak cannot use the now-welded shut escape hatch of *Benson* and *Warlick.*[16] Therefore, we will not address the forfeited argument of insufficient evidence to support the award of punitive damages.

▆▆▆▆ Finally, AIC and Vrdolyak argue that $150,000 total in punitive damages was excessive. We realize, of course, that the primary responsibility for deciding the appropriate amounts of such damages rests with the jury, and that the district court has already carefully reviewed the appropriateness of the verdict. We therefore review the district court's decision not to grant a new trial deferentially, for an abuse of discretion. *Cash v. Beltmann North American Co.,* 900 F.2d 109, 110 (7th Cir.1990). We will set aside a jury's award of punitive damages only if we are certain that it exceeds what is necessary to serve the objectives of deterrence and punishment. *Bogan v. Stroud,* 958 F.2d 180, 185 (7th Cir.1992); *see generally Federal Deposit Ins. Corp. v. W.R. Grace & Co.,* 877 F.2d 614, 622–23 (7th Cir.1989).

We do not find $150,000 excessive. That award is three times the amount of compensatory damages, and statutes routinely provide for double and treble damages awards to deter and· punish, though we note that here no fixed ratio is necessary or desirable. Furthermore, $150,000 is not out-of-line with awards we have upheld in the past. *See Hamed v. General Accident Ins. Co.,* 842 F.2d 170, 174–75 (7th Cir.1988) (upholding

$100,000 punitive damages award for bad faith breach of insurance contract); *Brown & Williamson Tobacco Corp. v. Jacobson,* 827 F.2d 1119, 1142–43 (7th Cir.1987) (upholding $2,050,000 punitive damages award in libel case, over twice the amount of compensatory damages), *cert. denied,* 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988); *Williamson v. Handy Button Mach. Co.,* 817 F.2d 1290, 1296 (7th Cir.1987) (suggesting that $100,000 punitive damages award in race employment discrimination case was not excessive).

Moreover, AIC is not a small company: it employed over 300 employees. Although AIC did not see fit to introduce extensive evidence of its value, evidence did show that AIC had gross yearly revenues of several million dollars. We think it reasonable to suppose that a sizeable award is both suitable and necessary to punish and deter a corporation of this size. *See Cash,* 900 F.2d at 111 & n. 3.[17]

As we have already noted, however, Vrdolyak cannot be held liable for her apportioned $75,000 share of the $150,000 punitive damages award. While the district court made AIC and Vrdolyak severally liable for their shares, it did so under the impression both would pay. Therefore, we remand the punitive damages award to the district court for consideration of whether Vrdolyak's share of punitive damages should drop out or should instead be imposed on AIC.

## E. Attorney's Fees

▆▆▆▆ After the district court entered judgment, Wessel petitioned for $100,709.70 in attorney's fees and $7,878.24 in costs. 42 U.S.C. § 2000e–5 provides that in the discretion of the court "the prevailing party, other than the Commission or the United States" may recover "reasonable" attorney's fees and costs. The attorney's fees Wessel requested

---

16. *Warlick* dealt with a case to which the amended version of Rule 50 was not applicable, so *Benson* still controlled. *See Warlick,* 969 F.2d at 308 n. 1.

17. AIC and Vrdolyak point to *Ramsey v. American Air Filter Co.,* 772 F.2d 1303 (7th Cir.1985). In *Ramsey,* we reduced as excessive a $120,000

award of punitive damages, to $20,000. However, in *Ramsey,* we emphasized that the district court had reduced the compensatory award as excessive, and that we had further reduced it, suggesting that the jury was generally impelled by irrational considerations. That is not the case here.

were therefore only for the work of his private attorneys, Lindquist & Vennum.

Wessel supported his petition with detailed records. AIC and Vrdolyak filed objections to Wessel's petition, arguing that the amount requested was excessive. Wessel replied to AIC's objections. On July 27, 1994, the district court awarded Wessel $48,632.98 in fees and the entire requested amount in costs. AIC and Vrdolyak appeal only the determination of attorney's fees; Wessel cross-appeals.[18]

The district court first determined that the hourly rates charged by Wessel's attorneys were reasonable. However, the court found that a few specific billings were unreasonable. In addition, the court agreed with AIC that Wessel's $107,000 fee request was

> wholly unreasonable considering the EEOC's representation of Wessel's interest in this matter.... [E]ven if the EEOC had not been representing Mr. Wessel I have a hard time concluding that over $100,000.00 of time was spent in preparing for a case that received such an early trial date and had limited discovery motions. Counsel argues that Mr. Wessel's interests were different from that of the EEOC but I find that they were very much related and a substantial portion of Lindquist & Vennum's work was in fact duplicative of the EEOC's.... It is undisputed that Mr. Wessel was represented at trial by three EEOC attorneys. These attorneys handled the bulk of the trial and the preparation of such. Further, while Lindquist & Vennum certainly contributed substantive arguments at trial it was not commensurate with what they are asking. Therefore ... Lindquist & Vennum's fee award will be reduced by fifty (50) percent after subtraction of the previously disallowed items.

The district court also discussed several specific areas where Lindquist & Vennum duplicated the EEOC's work.

We review an award of attorney's fees for an abuse of discretion. *Smith v. Great American Restaurants, Inc.*, 969 F.2d 430, 439 (7th Cir.1992). A district court may not arbitrarily reduce a fee award; it must instead provide a "concise but clear explanation" of why it reduced the total amount of hours or fees. *Id.*

The district court did not abuse its discretion. "Ours is not a case where the court eyeballed the request and cut it down by an arbitrary percentage because it seemed excessive to the court.... Rather, the district court took evidence and considered the nature of the case and the details of the request." *Tomazzoli v. Sheedy*, 804 F.2d 93, 97 (7th Cir.1986).[19] Wessel argues that more detailed rulings were necessary, but that is not the case. "The district court acted within its discretion when it chose to cut the number of hours by a lump sum in response to [appellant's] claim that the time was inflated. We endorse the court's approach as a practical means of trimming fat from a fee application; it is generally unrealistic to expect a trial court to evaluate and rule on every entry in an application." *Id.* It might have been preferable had the district court made a closer examination of the duplicative nature of the fees, but the examination made was close enough. We see no abuse of discretion.

### III. Conclusion

We REVERSE the district court as to the issue of Ruth Vrdolyak's individual liability. Therefore, in accordance with the judgment below, AIC is liable for $22,000 (plus interest) in back pay, $50,000 in compensatory damages, $48,632.98 in attorney's fees, and $7,878.24 in costs. We REMAND to the district court to determine the proper imposi-

---

**18.** Because we have already determined that Vrdolyak was not properly joined as a defendant, she cannot be liable for fees or costs.

**19.** The case before us is not analogous to *Hutchison v. Amateur Electronic Supply, Inc.*, 42 F.3d 1037, 1048 (7th Cir.1994). In *Hutchison*, we found an abuse of discretion, but the court made a more cursory examination of the fee request. Furthermore, we found that "more important" than the arbitrary nature of the reduction was the plaintiff's lack of opportunity to fully present his side of the argument before the district court made the reduction. Here, in contrast, Wessel and AIC extensively briefed all the issues.

tion of punitive damages.  We AFFIRM the district court as to all other issues.