**Gustavo STRINGEL, M.D.,**
**Plaintiff–Appellant,**

v.

**THE METHODIST HOSPITAL OF INDIANA, INC., and Eula Das, individually and in her capacity as Senior Vice–President of Methodist Hospital, Defendants–Appellees.**

No. 95–1820.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 27, 1995.

Decided July 12, 1996.

Michael C. Kendall (argued), Indianapolis, IN, for Gustavo Stringel, M.D.

Sydney F. Arak, Methodist Hosp. of Indiana, Inc., Indianapolis, IN, Frederick W. Lacava (argued), Indianapolis, IN, for Methodist Hosp. of Indiana, Inc., Eula Das.

Before FLAUM, ROVNER, and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Dr. Gustavo Stringel sued his former employer, The Methodist Hospital of Indiana, Inc., and his supervisor at Methodist, Eula Das, Ph.D., contending that he had been discharged in retaliation for filing an EEOC complaint alleging discrimination on the basis of his race and national origin. The district court granted summary judgment in favor of the defendants, finding that the hospital had legitimately terminated Stringel on the basis of his insubordination during a meeting with Das that culminated in the discharge. Stringel had covertly recorded that meeting, and the district court relied in part upon that recording in granting the defendants' motion for summary judgment. Although he did not object to the admission of the tape below, Stringel contends on appeal that the court committed plain error in considering the tape. We reject that argument and affirm.

**I.**

Methodist hired Stringel in 1990 to become its medical director of pediatric surgery and trauma department for a term of five years. Das, as the Senior Vice President for Patient Care Services, was his designated supervisor. The physician agreement that Stringel entered into with the hospital provided that either party could terminate the contract within the five-year term for "good cause."

By the Spring of 1992, relations between the hospital and Stringel had deteriorated. According to Stringel, within six months after he assumed his new position at Methodist, co-workers began to harass and discriminate against him because of his race and national origin (Stringel is Hispanic and was born in Mexico), giving rise to a hostile working environment. Among other disparagement, Stringel asserts that people made fun of his accent and that Das told him to "correct" it. Hospital personnel also expressed negative opinions about "foreign" doctors. For example, in November 1991, several physicians serving with Stringel on a search committee for a pediatric gastroenterologist made remarks impugning "foreigntrained" doctors and doctors with accents. In February 1992, Stringel reported that the head of

neonatology, Dr. Tom Malone, had ridiculed his accent in the presence of nurses and patients, and had changed one of Stringel's orders without first discussing the matter with him. Stringel brought his complaints to Das and asked her to investigate. Ultimately, he threatened to leave if appropriate actions were not taken. Stringel asserts that Das became angry with him, refused to investigate his complaints, and did nothing. Das and the hospital's attorney met with Stringel and his own attorney in March 1992 to discuss Stringel's complaints. Shortly after that meeting, Stringel filed a charge of discrimination with the EEOC.

Meanwhile, Das had begun to receive complaints about Stringel in November of 1991. Stringel's initial performance reviews had been positive (his first had been outstanding), but beginning in the Fall of 1991 Stringel had purportedly displayed unprofessional behavior. Nurses complained that he frequently raised his voice to them, was rude and demeaning, and became hostile when they questioned his orders. Stringel was also accused of refusing to meet with the parents of one of his pediatric patients and to assist other physicians when asked to do so.

Das responded to the complaints by issuing a memorandum to Stringel on March 24, 1992 notifying him that this conduct was unsatisfactory and should cease immediately. Stringel was warned in particular that he must control his temper and be more cooperative. He was admonished that he would be terminated forthwith if he did not demonstrate improvement in these areas. It was on the day after he received this memorandum that Stringel filed his EEOC charge.

Events came to a head on April 9, 1992, when Stringel and Das met to discuss Stringel's performance. From the outset, Stringel and Das disagreed about the purpose of the previously scheduled meeting: Das had expected Stringel to bring with him a written plan of action to address the various problems that the hospital had attributed to him, whereas Stringel believed that the purpose was to discuss his latest performance review. When Das told Stringel that he would have to submit his written plan by the end of the following day or face termination, Stringel accused her and the hospital of retaliating against him for his EEOC complaint. Stringel wanted to delve into the merits of his claims of discrimination, but Das demurred. Ultimately, Stringel told Das that she might as well spit in his face. Das became exasperated with what she perceived as Stringel's "badgering." In Stringel's presence, she telephoned William Loveday, the hospital's president, and requested permission to terminate Stringel. She received it, and Stringel was fired on the spot for his purported insubordination during the meeting.

After receiving a right-to-sue letter from the EEOC, Stringel filed a four-count complaint against Das and the hospital. Stringel alleged that the defendants had knowingly failed to investigate a hostile working environment and ultimately had fired him in retaliation for filing an EEOC charge, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* He also alleged that the defendants had discriminated against him in the performance and termination of his employment contract, in violation of 42 U.S.C. § 1981(a). Finally, Stringel asserted state law claims for a purported bad faith breach of contract and for the intentional infliction of emotional distress. William Loveday was among the defendants named in the complaint, but he was dismissed from the litigation early on. The court also dismissed the emotional distress claim against Das.

The district court subsequently granted summary judgment in favor of the Hospital and Das on the remaining claims. The court found the evidence insufficient to support Stringel's claims of discrimination under Title VII and section 1981(a). In support of the allegation that he had been made to endure a hostile environment, Stringel had proffered evidence which to a great extent was inadmissible hearsay. Moreover, the acts of harassment to which Stringel pointed were, in the court's view, neither severe nor pervasive enough to establish a hostile environment. As to the allegation that Stringel had been discharged in retaliation for filing an EEOC charge, the court reasoned that even if Stringel had presented enough evidence to establish a prima facie case of retaliation (*see generally Dey v. Colt Constr. &*

*Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir.1994)), the defendants had articulated a legitimate, non-discriminatory reason for terminating Stringel—insubordination—and Stringel had tendered no evidence tending to suggest that this reason was pretextual.

Indeed, Stringel brought forward nothing demonstrating that the Hospital tolerated outbursts similar to his by non-Hispanic doctors. Likewise, Stringel failed to show that non-Hispanic doctors were not terminated for insubordination or for their refusal to modify behavior they had been warned was unacceptable. Additionally, Stringel failed to show that the Defendants' proffered reason for terminating him is unworthy of belief.

March 15, 1994 Summary Judgment Entry at 16. With respect to the breach of contract claim, the court found no evidence that the Hospital had failed to comply with the provisions of Stringel's employment contract, which permitted either party to terminate the agreement for good cause upon notice to the other.

By setting out the areas of Stringel's performance that Das perceived as grounds for termination for cause, Das's March 24, 1992 memorandum complied with the written notice requirement under the Agreement. Further, the memorandum listed a series of remedial steps that Stringel would have to take if he intended to continue working for the Hospital. The memorandum indicated that Stringel's violation of certain of those steps would result in his immediate termination. Specifically, the March 24 memo indicated that if Stringel lost his temper one more time, he could be fired immediately. Further, the memo required that he not demonstrate animosity, uncooperativeness, or unpredictability, under penalty of immediate termination. No reasonable jury could find that Stringel's behavior during his April 9 meeting with Das complied with the written demands placed upon him in the March 24 memo. At his deposition, Stringel was unable to point to any demand outlined in the memorandum that was unreasonable. Likewise Stringel offered no evidence suggesting that the remedial steps were discriminatory.

Id. at 17–18 (record citation omitted). Finally, the court threw out the emotional distress claim against the Hospital, reasoning that there was no proof that the Hospital had committed the type of underlying tort necessary to support such a claim. *Id.* at 18.

As is evident from the passages we quoted above, the district court relied to some degree on Stringel's behavior during his April 9 meeting with Das in finding that Das and the Hospital had discharged him for the legitimate reason of insubordination. In moving for summary judgment, the defendants had put before the court a tape recording of that meeting, together with a transcript prepared by the defense. Stringel, it turns out, had walked into the meeting with a cassette recorder on his person and had recorded his entire encounter with Das without her knowledge. This he had revealed during his deposition. So the defendants made a copy of the tape, and defense counsel's secretary prepared a transcript. The defendants tendered the tape and transcript as proof that Stringel had, consistent with the representations Das made in her deposition, behaved in an uncooperative, insubordinate manner to her during the April 9 meeting. Stringel did not object to the admission and consideration of the tape and transcript, and indeed himself pointed to statements made on the recording in support of his own arguments in opposition to summary judgment.

Six months after the district court entered summary judgment in favor of the defendants, however, Stringel filed a motion pursuant to FED. R. CIV. P. 60(b) questioning the accuracy of the transcript that the defendants had submitted more than a year earlier in seeking summary judgment. In his motion, Stringel noted that the court had apparently relied on that transcript in assessing his behavior at the April 9 meeting between Das and himself. Yet, Stringel now asserted, the defendants' transcript "contained significant deletions, alterations, and omissions, totaling in excess of seven hundred (700) which significantly altered the thrust of the firing meeting." R. 180 at 2–3. The defendants had acted in bad faith and committed a fraud upon the court, Stringel charged. In support

of his allegations, Stringel submitted two alternate transcripts of the April 9 meeting. One was prepared by a professional reporter. The other is essentially a revised version of both that transcript and the defendants' original transcript, incorporating the corrections and additions of Roger W. Shuy, Ph.D. Dr. Shuy is a professor of linguistics at Georgetown University who has made a specialty of analyzing recorded conversations and transcripts of those conversations. Shuy had prepared a report documenting the errors in the defendants' transcript, many of which he labelled "ludicrous." *E.g.*, R. 183 Ex. A–2 at 2, 5. His report also set forth a linguistic analysis of the tape which, in short, indicated that Stringel's behavior during the April 9 meeting was not insubordinate, but a reasonable response to the different agendas that Das and Stringel had brought to that meeting.

Clearly, GS's [Stringel's] primary topic is his PDR evaluation, constituting 40 percent of his topics. All other topics are considerably less frequent. In contrast, ED's [Das'] major topics are GS's termination, plan of action, evaluation of GS, and badgering by GS. All others, including GS's major topic, are minor to her. What can we conclude from this? We have two feisty participants at loggerheads,with different agendas for the conversation, each jockeying to get his or her own topic on the floor.

Equally clear is that this conversation had a history. Each participant came to it with different perceptions about what it was to accomplish (whether or not these were accurate), different perceptions about past events leading up to the conversation (whether or not these were accurate), and, it is apparent, no particular love for each other.

*Id.* at 7. Ultimately, Shuy suggested, Das was equally if not more culpable for the escalation in rhetoric and tone of the meeting.

At issue here is how the argument escalated to the point at which the only resolution was termination. ED claimed "badgering" was one cause and "not following your plan of action" was another. Of first concern was what ED meant by badgering. Most definitions of badgering include words such as, "bait, annoy and persistently harass." GS was certainly persistent and, to ED at least, annoying. Badgering is not merely disagreement (of which there was much in this conversation). Baiting is more causal in its definition, involving enticement with a lure or a trap of some type.... [T]he challenges posed by ED best fit the definition of lures or traps. If one wishes to receive disagreement, argument or complaint from the other party, there is not a better way to do it than to change what is perceived to be the agenda, to challenge the other speaker, to call the other person's position "bullshit," and to threaten with dire action, especially after one has received from that person his agreement that the terms would, indeed, be met on schedule. Baiting was clearly the province of ED in this conversation.

ED's other justification for terminating GS, "not following your plan of action," is in appropriate [sic] in light of the fact that GS did not discuss his plan of action, stating that he would present it tomorrow as specified in the letter cited by ED. It is difficult to imagine how he could have failed to follow something that has not yet been presented.

*Id.* at 10.

The district court denied Stringel's motion. In relevant part, the court's opinion noted that the tape of the April 9 conversation had been in Stringel's possession since the day he made it; he therefore could have had his own transcript prepared at any time. March 1, 1995 Post Judgment Entry at 8. The court also pointed out that the transcript itself was only a demonstrative exhibit and did not play any substantive role in its decision to grant the defendants' motion for summary judgment. *Id.* at 8 & n. 9, 13, 14. In determining that Stringel had behaved in such a way as to justify his dismissal for insubordination, the court explained, it had relied less on the substance of Stringel's conversation with Das than upon his "generally combative tone." *Id.* at 8 n. 9. To the extent that the defense transcript had played any part in that decision, the court indicated, its rationale was

unaffected by the revised transcript that Stringel had belatedly submitted. *Id.* at 8–9, 14, 15–16.

## II.

When offered into evidence, a tape recording must normally be accompanied by proof that the recording is what it is purported to be. *See* FED. R. EVID. 901(a). In criminal cases, the prosecution often seeks to prove the defendant's guilt by way of tape recordings, and in that context, we have held that "the government must prove, by clear and convincing evidence, that the tape is a true, accurate, and authentic recording of the conversation, at a given time, between the parties involved." *United States v. Welch*, 945 F.2d 1378, 1383 (7th Cir.1991) (internal quotation marks & citation omitted), *cert. denied*, 502 U.S. 1118, 112 S.Ct. 1235, 117 L.Ed.2d 469 (1992). (We shall assume without deciding that the proponent of a tape recording bears the same burden in a civil case.) *United States v. McKeever*, 169 F.Supp. 426, 430 (S.D.N.Y.1958), *rev'd on other grounds*, 271 F.2d 669 (2d Cir.1959), sets out a rather formal, seven-step checklist for the authentication of tape recordings, and we have looked to some of the factors included in that list, including " 'the competency of the operator, the fidelity of the recording equipment, the absence of material alterations in the relevant portions of the recording, and the identity of the speakers.' " *United States v. Faurote*, 749 F.2d 40, 44 (7th Cir.1984) (quoting *United States v. Hughes*, 658 F.2d 317, 322 (5th Cir.1981), *cert. denied*, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982)). We have also emphasized the district court's obligation to ascertain that the recording itself is sufficiently audible to constitute reliable evidence of the conversation recorded. *E.g., United States v. Howard*, 80 F.3d 1194, 1198–99 (7th Cir. 1996). But, consistent with the terms of Rules 901(a)[1] and 1003,[2] we have eschewed any formalistic approach to the admission of tape recordings or copies thereof. *See, e.g., United States v. Carrasco*, 887 F.2d 794, 802 (7th Cir.1989) ("In the case of either an original or a duplicate tape the government may establish a foundation for accuracy and truth of the tape through 'evidence of a chain of custody and by the correspondence between the tape's version of the events ... and the recollections of eyewitnesses to those events; in this circuit, either variety of evidence can establish a tape's foundation.' ") (quoting *United States v. Blakey*, 607 F.2d 779, 787 (7th Cir.1979)). *See generally* 5 Christopher B. Mueller & Laird C. Kirkpatrick, FEDERAL EVIDENCE § 524 (2d ed. 1994).

In offering the tape of Stringel's April 9 meeting with Das in support of their motion for summary judgment, the defendants did not make any formal attempt to lay a foundation for admission of the tape into evidence. Das, in an affidavit submitted with the summary judgment motion, indicated that she had reviewed the defense transcription of the tape and that she believed "that the transcription accurately reflects the exchange between Dr. Stringel and me." R. 70 at 16 para. 34. Of course, as in any case, it is the tape recording of the conversation that constitutes evidence of what was said, not the transcript. *E.g. Howard*, 80 F.3d at 1198. It is not clear from Das' affidavit that she had listened to the tape at all. *See* R. 70 at 16–17 para. 34. At the same time, although it is evident that the district court listened to and relied on the tape in granting the summary judgment motion, there are no findings in the court's ruling as to the admissibility of the tape.

Stringel thus argues that the tape was introduced into evidence and relied upon by the district court without any foundation establishing that the tape was an accurate, reliable, and understandable recording of the fateful conversation between Das and Strin-

---

1. Rule 901(a) provides:

   The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

2. With respect to duplicates of tape recordings and other types of evidence, Rule 1003 provides:
   A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

gel. In fact, Stringel asserts, the tape is not reliable. That point is proven, he argues, by the disparities between the error-laden transcript submitted to the court by the defense, and the corrected transcripts he submitted in support of his Rule 60(b) motion. In other words, the disparities demonstrate that the tape is difficult to understand. Thus, Stringel reasons, it was improper for the court, especially on summary judgment, to rely on that tape in determining that Stringel's conduct during the April 9 meeting was, as the defense contended, insubordinate. Stringel did not, of course, object to the tape when it was submitted to the court. Consequently, he can only argue that the court's decision to admit and consider the tape was plain error.

Before we go any further, we must emphasize the limited nature of the question before us. Stringel does not contend that the district court erred in granting summary judgment other than in deeming the tape to be admissible evidence and thus in considering the contents of the tape in deciding the motion. We have not been asked to decide, for example, if and when it is appropriate for a district court, on summary judgment, to assess the tone of a recorded conversation or the verbal demeanor of a participant in that conversation, as the district court. did here. Stringel argues that the district court may have been misled as to the tone of his fateful meeting with Das based on the errors in the defendants' transcript, but he does not call into question the court's license to assess such matters on summary judgment. We therefore do not take up that question. Nor do we consider whether the district court abused its discretion in denying Stringel's motion to set aside the judgment pursuant to Rule 60(b); Stringel does not suggest that it did so. We do not mean to intimate that we have any doubts as to these aspects of the proceedings below. We mean simply to clarify that our holding in this case is limited to the plain error question that Stringel has raised.

■ As a general rule, we do not recognize plain errors in civil cases, unless they affect our subject matter jurisdiction. *Prymer v. Ogden*, 29 F.3d 1208, 1214 (7th Cir.), *cert. denied*, ⸻ U.S. ⸻, 115 S.Ct.

665, 130 L.Ed.2d 599 (1994) (citing *Maul v. Constan*, 928 F.2d 784, 787 (7th Cir.1991)); *see also Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1150 (7th Cir.1989). Yet, FED. R. EVID. 103, which requires a timely objection to the admission of evidence in order to preserve the issue for appellate review (Rule 103(a)(1)), expressly embraces the plain error doctrine:

> Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the district court.

Rule 103(d). Consequently:

> "The plain error doctrine may be available to review evidentiary rulings to which no objection was made at trial if a moving party can demonstrate (1) that exceptional circumstances exist, (2) that substantial rights are affected, and (3) that a miscarriage of justice will result if the doctrine is not applied."

*Prymer*, 29 F.3d at 1214 (quoting *Deppe v. Tripp*, 863 F.2d 1356, 1362 (7th Cir.1988)); see also *Zayre*, 882 F.2d at 1151. We conclude that Stringel has not met the first and third of these requirements.

■ A showing of plain error requires extraordinary circumstances, and there are none here. Stringel himself made the tape and was, of course, a participant in the conversation he recorded. No one was in a better position than he to know whether the tape truly and accurately reflected his conversation with Das. He can hardly claim surprise when the defense offered the tape in support of its motion for summary judgment. Because Das terminated him for his purported insubordination during the very meeting he recorded, the tape was sure to be a key piece of evidence in the case. Both he and Das were questioned about the April 9 meeting during discovery. Moreover, Stringel himself disclosed the existence of the tape during his deposition and cited it as a means to confirm a particular remark he recalled making to Das. R. 83 at 62. Indeed, he appears to have already prepared some sort of transcript of his own at that point. *See id.* Thus, to the extent Stringel had doubts about the authenticity, reliability, or accuracy of the tape, he should have been prepared to

raise them when the defense offered a copy of the tape into evidence. Insofar as the accuracy of the transcript of that tape recording is at issue (although, again, the tape was the real evidence here), Stringel was likewise as well situated as the defense to know whether the transcript was faithful to the tape. He was, we reiterate, a participant in that conversation, and as the maker of the recording, he had more time than anyone else involved in the lawsuit to become familiar with its contents. In short, his silence in the summary judgment briefing as to the admissibility and fidelity of either the tape itself or the transcript of the tape cannot be attributed to any disadvantage on his part, but to an apparent indifference as to these matters. Stringel's failure to present his alternate transcripts and analysis before the court decided the summary judgment motion was, as the district court noted, "inexcusable." March 1, 1995 Post Judgment Entry at 11.[3]

We may assume that any error in the erroneous admission of the tape affected Stringel's substantial rights. In moving for summary judgment on the retaliation question, the defendants repeatedly pointed to the tape as evidence of the insubordination for which Stringel purportedly was discharged. *E.g.*, R. 68 at 14–15, 28, 29. Similarly, in stating that "[n]o reasonable jury could find that Stringel's behavior during his April 9 meeting with Das complied with the written demands placed upon him in the March 24 memo" (March 15, 1994 Summary Judgment Entry at 17), the district court clearly relied on the tape. Thus, if the tape did not, for some reason, accurately reflect what occurred during that fateful meeting at which Stringel was terminated, Stringel may have been prejudiced by the court's reliance on that tape in assessing Stringel's conduct.

Yet, despite Stringel's arguments about the lack of a proper foundation for the tape and his insinuations as to the reliability of the tape, no case has been made for the proposition that a miscarriage of justice will occur if we do not deem the district court's acceptance of the tape to be plainly erroneous. Stringel has never argued that the copy of the tape offered into evidence by the defense was not an authentic and accurate recording of his conversation with Das. He has not claimed, as one of the two participants in the conversation, that the tape recorder failed to pick up some crucial portion of the dialogue. A review of the tape reveals no gaps or failures in the recording device. The conversation reflected on the tape is, moreover, consistent with the accounts Stringel and Das gave in discovery. All of this suggests that despite the lack of a formal foundation, the district court committed no plain error in relying on the tape in granting the defendants' motion for summary judgment. *See Blakey*, 607 F.2d at 787 n. 14 ("If there is independent evidence of the accuracy of the tape recordings admitted . . . , we shall be extremely reluctant to disturb the trial court's decision even though at the time that decision was made the [proponent] had not carried its particularized burden of going forward.") (quoting *United States v. Biggins*, 551 F.2d 64, 67 (5th Cir.1977)).

Stringel's argument, ultimately, rests on the defense transcript, its many errors, and

---

3. Stringel argues that because the transcript was prepared and tendered as accurate by defense counsel, he was entitled to assume that the transcript was, in fact, fully faithful to the tape recording. We do not quarrel with the notion that attorneys should not be offering into evidence transcripts or other documents that they know to be unreliable, but there is no evidence that the inaccuracies in the defense transcript were intentional or even that the defense was aware of them when it tendered the tape and transcript. Transcription of audio recordings is a difficult business. Even when the quality of the recording is good, it is often a challenge to discern what people are saying, particularly when they interrupt one another and speak over one another, as Das and Stringel often did during their conversation. *See Howard*, 80 F.3d at 1198. The mistakes in the defense transcript appear to be the types of mistakes that are routinely made in transcribing tapes, and certainly they do not, in and of themselves, evince an attempt to mislead the court as to the content of the tape. Indeed, the district court rejected any suggestion that the defense transcript "worked a fraud or misrepresentation on the court." March 1, 1995 Post Judgment Entry at 14. In any event, the fact that the transcript was held up by the defense as accurate did not excuse Stringel from raising in a timely manner the types of objections he attempts to make now, particularly given that he was well situated, as a participant in the recorded conversation and the maker of the tape, to raise those objections at the outset.

what those errors, in Stringel's view, suggest about the reliability of the tape. As we have said, Stringel believes that the many differences between the defense transcript and the plaintiff's transcript (as prepared by the reporter and edited by Dr. Shuy), prove the tape to be very difficult to hear and therefore unreliable. Not so. We have listened to the tape, and as these types of recordings go, it is not bad. There are some inaudible portions, especially when Stringel and Das speak over one another, but this is a common phenomenon. The fact that there are errors in the original transcript prepared by the defense is hardly extraordinary. It takes a practiced ear long hours of listening, and many drafts to transcribe a conversation correctly. It is apparent that the defense simply did not take as much time as it should have to prepare and revise its transcript. The transcript is, in any event, no more than a guide; and there is no evidence that the district court treated it as anything more. In denying Stringel's Rule 60(b) motion, the court made clear that it had properly relied on the tape, not the transcript. We take the court at its word. This tape certainly was not, as Stringel suggests, so unintelligible that a listener, and in particular the district court, would have been forced to rely on an inaccurate transcript as the evidence of what was actually said. *See Howard,* 80 F.3d at 1198–99, 1200. Finally, despite repeated mention of the 700 errors that Dr. Shuy identified in the defense transcript, Stringel failed to identify even one in his opening brief that might have had an impact on the district court's assessment of his conversation with Das. Having reviewed the tape and the transcripts ourselves, we are satisfied that none of the errors, singly or cumulatively, was material to an overall assessment of the conversation. Words were often omitted or misheard altogether, but we found no error that was gravely misleading or so subtle that the court, in listening to the tape, would have failed to catch the mistake itself.

For all of these reasons, we conclude that there was no plain error in the admission and consideration of the tape recording. Any questions as to foundation could and should have been raised in the summary judgment briefing. Even now, Stringel has failed to identify any concrete prejudice that he suffered from the court's use of the tape. This is not the rare case in which the plain error doctrine may be invoked to relieve Stringel of the failure to raise his concerns in a more timely manner.

### III.

As is evident from the requirements we have articulated for the demonstration of plain error in a civil action, relief is reserved for the truly extraordinary case. A party invoking the doctrine thus bears a heavy burden in attempting to convince the court that the judgment below should be reversed on the basis of an error that was not brought to the district court's attention. Whatever shortcomings there may have been in the foundation that the defendants offered for admission of the tape recording, Stringel has made virtually no showing that the admission of the tape resulted in any identifiable prejudice to him. His real focus, as we have noted, has been on the inaccurate defense transcript of the tape, on which the district court expressly noted it did not rely. Stringel's appeal was doomed from the outset, and that much should have been apparent to him given the compelling showing that a reversal on the basis of plain error requires. The defendants' attorney warned Stringel's counsel by letter at the outset of this appeal that he believed there was no legitimate ground for appeal and that he planned to seek sanctions if the briefing bore this out. In our view, it has. Circuit Rule 38 permits an award of costs to the appellee in the case of a frivolous appeal, which we define as one "prosecuted with no reasonable expectation of altering the district court's judgment and for purposes of delay or harassment or out of sheer obstinacy." *Flexible Mfg. Sys. Pty. Ltd. v. Super Prod. Corp.,* 86 F.3d 96, 100 (7th Cir.1996) (internal quotation marks and citations omitted). This appeal falls squarely within that category. We therefore find Rule 38 sanctions appropriate, and direct the defendants to submit an accounting of the costs they incurred in defending this appeal within fifteen days.

The district court's grant of summary judgment in favor of the defendants is AF-FIRMED.